**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1147

_____

| | | |
|---|---|---|
| Lois E. Jenson; Patricia S. Kosmach; Kathleen O'Brien Anderson, on their own behalf and on behalf of all others similarly situated; | * * * * * | |
| Plaintiffs - Appellants, | * * | |
| Angel Alaspa; Shirley Burton; Audrey Daniels; Marilyn Greiner; Diane Hodge; Joan Hunholtz; Judy Jarvela; Mavie Maki; Michelle Mesich; Priscilla Robich; Debra Sersha; Marcia Steele; Marjorie Tolbert; Denise Vesel, | * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| Appellants, | * * | |
| v. | * * | |
| Eveleth Taconite Company; Eveleth Expansion Company; Oglebay Norton Company; Oglebay Norton Taconite Company, doing business as Evelyth Mines; United Steelworkers of America, Local 6860, | * * * * * * | |
| Defendants - Appellees, | * * * | |
| ----------------------------------------------- | * * | |
| NOW Legal Defense and Education | * | |

Fund,                                    *
                                         *
          Amicus Curiae,                 *
                                         *
National Employment Lawyers              *
Association,                             *
                                         *
          Amicus Curiae.                 *
                        _____


                 Submitted:  October 21, 1997
                 Filed:   December 5, 1997
                        _____


Before McMILLIAN, FLOYD R. GIBSON and LAY, Circuit Judges.
                        _____

LAY, Circuit Judge.

This case has a long, tortured, and unfortunate history.  In August 1988, Lois Jenson and Patricia Kosmach filed a class action suit against Eveleth Mines[1] alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2, and the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363.03, subd. 1(2).  Three years later, the district court certified a class of plaintiffs that includes those who have been employed at Eveleth Mines in Eveleth, Minnesota, after December 30, 1983.  See Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 667 (D. Minn. 1991) (Jenson I).[2]

_____

[1]The named defendants are Eveleth Taconite Company, Eveleth Expansion Company, Ogelbay Norton Company, and Ogelbay Norton Taconite Company (collectively  referred to as ?Eveleth Mines").

[2]Specifically, the district court defined the class to include:

all women who have applied for, or have been employed in, hourly positions at Eveleth Mines at any time since December 30, 1983, and who have been, are being, or, as a result of the operation of current practices,

-2-

On May 13, 1993, the district court found Eveleth Mines liable on plaintiffs' classwide claims of (1) sex discrimination in promotions to the position of "step-up foreman" and foreman, and (2) sexual harassment. Jenson v. Eveleth Taconite Co., 824 F. Supp. 847, 889 (D. Minn. 1993) (Jenson II).[3] On July 29, 1993, in accordance with 42 U.S.C. § 2000e-5(f)(5) and Federal Rule of Civil Procedure 53, the court appointed a Special Master to consider the compensatory damages and punitive damages claims under the MHRA raised by sixteen female employees of Eveleth Mines.[4] The compensatory damages plaintiffs sought included back pay, front pay, and damages for past and future mental anguish. See Minn. Stat. § 363.071, subd. 2 (administrative law judge may award damages for mental anguish); Minn. Stat. § 363.14, subd. 2 (allowing district court judge to award same relief).

---

will be discriminated against with regard to the terms and conditions of their employment because of gender.

Jenson I, 139 F.R.D. at 667.

[3]The district court concluded the plaintiffs did not prevail on their classwide claims relating to sex discrimination in hiring, job upgrades and assignments, compensation, training, hiring into craft positions, discipline and retaliation. Jenson II, 824 F. Supp. at 889. The district court dismissed those claims with prejudice. Id. The plaintiffs have not appealed that ruling.

[4]In 1988, when plaintiffs filed this suit, Title VII limited remedies available under it to backpay, injunctions, and other equitable relief. See United States v. Burke, 504 U.S. 229, 238 (1992); 42 U.S.C. § 2000e-5(g). In 1991, Congress enacted 42 U.S.C. § 1981a, which allows plaintiffs to bring claims for punitive and compensatory damages against private defendants who intentionally violate Title VII. See Section 102 of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified at 42 U.S.C. § 1981a). However, the Supreme Court has held that § 1981a only applies to cases arising after its 1991 enactment. See Landgraf v. USI Film Products, 511 U.S. 244, 293 (1994).

The MHRA does not, however, define mental anguish. In his Report, the Special Master said mental anguish includes mental suffering caused by painful emotions such as indignation, wounded pride, shame, public humiliation and despair. Report and Recommendation, Jenson v. Eveleth Taconite Co., Civ. 5-88-163 (D. Minn. Mar. 28, 1996), Appellants' Addendum at 65; See also Black's Law Dictionary, 985-86 (6th ed. 1990) (mental anguish includes mental sensation of pain resulting from emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair and public humiliation). The Special Master thereafter allowed extensive discovery, took 7469 pages of testimony during a seven-week trial, and issued a 416-page Report and Recommendation. The Special Master awarded damages for mental anguish to various members of the class.[5] See Appellants' Addendum at 466-67.[6]

_____

[5]The Special Master rejected plaintiffs' attempt to divide their mental anguish claims into separate impairments such as loss of enjoyment of life and impairment of reputation. Appellants' Addendum at 65 n.14. The district court concurred in this ruling. We find no abuse of discretion or error at law in such a ruling. Plaintiffs have not pled a separate claim for defamation. To the extent that we understand plaintiffs' argument, we would agree that in evaluating damages for mental anguish, plaintiffs are entitled to have the trier of fact weigh evidence such as public humiliation, shame, and despair. Furthermore, if the emotional harm has caused an impairment to a plaintiff in living a normal life, this too can be evaluated as compensable damages. The Special Master acknowledged as much when he observed: "[m]ental anguish can interfere with work performance or cause physical, social, emotional or other stresses, alone or in combination." Id. However, as the Special Master ruled, these claims cannot serve as separate causes of action, especially when the plaintiffs did not plead them.

[6]The specific awards were as follows: for Angel Alaspa the amount of $6,000; for Kathleen Anderson the amount of $20,000; for Shirley Burton the amount of $20,000; for Audrey Daniels the amount of $15,000; for Marilyn Greiner the amount of $25,000; for Joan Hunholz the amount of $5,000; for Judy Jarvela the amount of $20,000; for Lois Jenson the amount of $25,000; for Mavie Maki the amount of $5,000; for Michelle Mesich the amount of $18,000; for Priscilla Robich the amount of $2,500; for Deborah Ann Sersha the amount of $5,000; for Marcia Steele the amount of $6,000; for Marjorie Tolbert the amount of $7,000; and for Denise Vesel the amount of $3,000. The Special Master found that the claims of Diane Hodge were time barred,

Plaintiffs thereafter filed objections to the Special Master's Report. The district court affirmed the Special Master's Report and Recommendation. See Memo. Op. and Order, Jenson v. Eveleth Taconite Co., Civ. No. 5-88-163 (D. Minn. Nov. 12, 1996), Appellants' Addendum at 46-47. This appeal followed.

On appeal, the plaintiffs generally attack the analysis and rationale the Special Master used in awarding damages. Plaintiffs also raise individual claims as to constructive discharge, the statute of limitations, whether one claim has survived one of the plaintiff's death, and the Special Master's failure to award punitive damages. We address these claims separately, infra. Plaintiffs assert the damages awards do not make the women whole and are totally inadequate and ?shocking." We share plaintiffs' concern regarding the inadequacy of the damages. We are most concerned, however, with the Special Master's erroneous application of legal principles governing the award, and his restrictive rulings limiting the testimony of plaintiffs' expert witnesses. Therefore, we focus our analysis on these legal errors.

Although the defendant does not question liability on appeal, we briefly mention it for historical relevance to our review of the award of compensatory damages and the denial of punitive damages.[7] Any fair reading of the record requires this court to acknowledge that the sexual harassment conducted against the member class,

_____

but in the event they were not, he recommended she be awarded $7,000. In addition, the Special Master recommended that Eveleth Mines pay a statutory penalty of $32,000 to the State of Minnesota, pursuant to Minn. Stat. § 363.071, subd. 2.

[7]Under the current MHRA, punitive damages are limited to $8,500 per individual. Minn. Stat. § 363.071, subd. 2 (1996). The Special Master concluded that at the time plaintiffs filed their claim, the MHRA limited punitive damages to $6,000 per individual. Appellants' Addendum at 459; Minn. Stat. § 363.071, subd. 2 (1986). Plaintiffs do not dispute the Special Master's conclusion that $6,000 is the maximum amount of punitive damages available to them under the MHRA.

-5-

individually and as a whole, is, to say the least, egregious. In certifying the class, Judge Rosenbaum summarized the preliminary evidence as follows:

> Sexually explicit graffiti and posters were found on the walls and in lunchroom areas, tool rooms, lockers, desks, and offices. Such material was found in women's vehicles, on elevators, in women's restrooms, in inter-office mail, and in locked company bulletin boards.
>
> Women reported incidents of unwelcome touching, including kissing, pinching, and grabbing. Women reported offensive language directed at individuals as well as frequent **?**generic" comments that women did not belong in the mines, kept jobs from men, and belonged home with their children.

Jenson I, 139 F.R.D. at 663.

Judge Kyle, in finding liability, held that "Eveleth Mines engaged in a pattern or practice of maintaining [a work] environment sexually hostile to women." Jenson II, 824 F. Supp. at 888. The court found sexual harassment was a **?**standard operating procedure" at Eveleth Mines. Id. at 888. In finding Eveleth Mines liable for creating or condoning a hostile work environment, the district court found:

> [s]exual harassment at Eveleth Mines was so pervasive that an inference of knowledge arises. . . . In addition, many of Eveleth Mines' first-line supervisors had actual knowledge of the harassing behaviors: some foremen participated in them and others worked closely with those who did. Further, management personnel testified that they saw photos and graffiti of a sexual nature.

Jenson II, 824 F. Supp. at 887.

Judge Kyle made numerous findings regarding the nature of the working environment at Eveleth Mines. He found Eveleth Mines male-dominated in terms of

power, position, and atmosphere.  Jenson II, 824 F. Supp. at 879.  Judge Kyle found that male-focused references to sex and to women as sexual objects created a sexualized work place.  Id.  These references included graffiti, photos, and cartoons that male employees, including bargaining unit and salaried employees such as foremen, displayed throughout Eveleth Mines.  Id. at 879-880.  Other references included ?verbal statements and language reflecting a sexualized, male-oriented, and anti-female atmosphere."  Id. at 880.  Some male employees subjected female employees to physical conduct of a sexual nature.  In one incident, a male employee pretended to perform oral sex on a sleeping female co-worker.  Id. at 880.  Other incidents involved men touching women in an objectionable manner.  Id.  Some women were presented with various sexual materials.  Id.  Judge Kyle concluded ?the presence of sexual graffiti, photos, language and conduct . . . told women that the sex stereotypes reflected in and reinforced by such behavior were part and parcel of the working environment at Eveleth Mines."  Id. at 884.

The district court concluded that ?Eveleth Mines made no effort [to] eradicate the hostile environment existing within its facilities."  Id. at 888.  We emphatically reject the Special Master's conclusion in his Report that the fact that the culture of the Iron Range mining industry allowed sexual harassment is a mitigating factor for Eveleth Mines.  See Appellants' Addendum at 461.  Instead, we find this observation underscores the overall culpability of Eveleth Mines.

The Special Master's report reflects prodigious effort.  Nonetheless, the Special Master's written findings contain numerous statements that lead us to question whether the Special Master fairly evaluated the plaintiffs' claims.[8]  We make this observation

---

[8]Many of these comments are challenged by amici (National Organization of Women et al.) on the ground that the Special Master was guilty of gender bias. The plaintiffs do not raise a claim of gender bias, and thus, we do not address such a claim.

to support our conclusion that on remand, the district court must approach the recorded testimony and any supplemental testimony on a *de novo* basis.

Our review and vacation of the district court's findings primarily turn on the Special Master's misapplication of legal principles regarding causation and admissibility of expert testimony. We review these conclusions of law *de novo*. See Pullman-Standard v. Swift, 456 U.S. 273, 290 n.19 (1982).

## I. Causation

In his Report, the Special Master stated that ?[a] sexual harassment case based upon a hostile work environment, not quid pro quo, is founded on principles of negligence and conventional rules of civil litigation, including the doctrine of proximate cause, apply." Appellants' Addendum at 67 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 253 (1990); Danz v. Jones, 263 N.W.2d 395, 399 (Minn. 1978); Department of Human Rights v. Spiten, 424 N.W.2d 815, 818 (Minn. Ct. App. 1988)). Plaintiffs claim the Special Master misapplied the burden of proof regarding the issue of causation. Confusion about the correct burden of proof set in at the early stages of discovery. Before trial, the defendants sought discovery of the personal background of each of the plaintiffs relating to events that allegedly affected plaintiffs' emotional well-being. Personal events defendants sought to discover included detailed medical histories, childhood experiences, domestic abuse, abortions, and sexual relationships, etc. The plaintiff class describes this as the ?scorched earth" defense.

We would agree that much of the discovery (e.g., domestic abuse, earlier illnesses, and personal relationships, etc.) was not relevant or was so remote in time, that it should not have been allowed. Plaintiffs sought protective orders, but the Special Master denied the requested orders. The Special Master appears to have based this denial, in part, on Eveleth Mines' concession that it had the burden of proof to show plaintiffs' various personal experiences outside of the work environment caused

plaintiffs' emotional injuries. See Eveleth Mines' Memo. in Supp. of Defs.' Req. for Modification of Special Master's Order of May 31, 1994, Jenson v. Eveleth Taconite Co., No. 5-88-163 (D. Minn. Aug. 24, 1994), Appellants' App. at 178; Jenson v. Eveleth Taconite Co., Civ. No. 5-88-163, (D. Minn. Sept. 29, 1994) (order allowing comprehensive depositions of plaintiffs regarding their medical records). The concession arose from defendants' pleading that plaintiffs' injuries were caused by the conduct of "plaintiffs and/or others over whom [Eveleth Mines] had no control." Eveleth Mines' Answer at ¶15 & Eveleth Mines' Am. Answer at ¶20, Jenson v. Eveleth Taconite Co., No. 5-88-163 (D. Minn. Sept. 6, 1988 & Mar. 31, 1989), Appellants' App. at 94, 127.

Somehow, and without explanation, between the time of discovery and the time of trial, the Special Master found it was plaintiffs who had the burden to show aggravation of a pre-existing condition, and that under Minnesota law **?**the damages recoverable are limited to additional injury directly caused by the aggravation." Appellants' Addendum at 88 (citing Minnesota Jury Instruction Guide 163; Schore v. Mueller, 186 N.W.2d 699 (1971); Nelson v. Twin City Motor Bus Co., 58 N.W.2d 561 (1953)). The Special Master observed:

> [t]he issues inevitably raised are whether or not the total harm can be apportioned between two or more direct causes, and, if so, the ascertainment of the portion of harm which was caused by each of the direct causes. Both issues pose mixed questions of law and fact, and must be determined on evidence presented, but the evidence may be enhanced by an assumption that if the party bearing the burden of proof fails to produce evidence showing that the total damage is capable of reasonable apportionment between causes the issues will be resolved adversely to that party. If the aggravation of a pre-existing disability or defect issue is raised as a defense, or by the defense as bearing upon reasonable damages, the burden of proof on apportionment rests on defendant. If, however, the issue is raised by plaintiff, the burden of proof rests upon plaintiff. See Marshall v. Galvez, 480 N.W.2d 358, 362 (Minn. Ct. App.

1992). Here, the issue was raised by plaintiffs, and plaintiffs were impressed with the burden of proving that total damage can be reasonably apportioned. Plaintiffs have offered no evidence on this issue, and, consequently, the contention must fail for lack of proof.

Appellants' Addendum at 88-89 (emphasis added).

In affirming the Special Master, the district court concluded the Special Master did not commit clear error in finding **?**[p]laintiffs had raised the question [of aggravation of pre-existing condition] and had not borne the burden of proving that the pre-existing condition and the total damage could be sorted out." Appellants' Addendum at 34-35. In this regard, the district court erred.

It is fundamental that a party pleading a claim or defense has the burden of proof to establish that claim or defense. See Fed. R. Civ. P. 8 (requirements for pleading claims and defenses); Fed. R. Civ. P. 9 (requirements for pleading special matters). Neither the Special Master nor the district court relate how the plaintiffs ever asserted or pled aggravation of a pre-existing condition. Indeed, it appears plaintiffs made no such claim. As such, plaintiffs bear no burden to prove apportionment. Apportionment of damages is akin to an affirmative defense.[9]

---

[9]Apportionment arises when two or more causes have combined to bring harm to a plaintiff. See Restatement (Second) of Torts § 433A (1965). A defendant availing itself of apportionment seeks to limit its liability by showing that although its conduct was a substantial factor in harming plaintiff, that conduct only caused part of plaintiff's harm. See id. The defendant seeks to limit its liability to that portion of plaintiff's harm that the defendant actually caused.

The single indivisible injury rule imposes joint and several liability when two or more persons acting independently cause harm to a third person through consecutive acts of negligence closely related in point of time. See Canada v. McCarthy, 567 N.W.2d 496, 507 (Minn. 1997) (citing Mathews v. Mills, 288 Minn 16, 20-21, 178 N.W.2d 841, 844 (1970)). If the harm is indivisible, each actor is liable for the entire

Moreover, apportionment may only be asserted when damages are divisible. See Mitchell v. Volkswagenwerk, A.G., 669 F.2d 1199, 1206 (8th Cir. 1982); Canada v. McCarthy, 567 N.W.2d 496, 507 (Minn. 1997); Restatement (Second) of Torts § 433A (1965).[10]  The Special Master found, as a matter of law, there was no showing that any damages the plaintiffs suffered were divisible. See Appellants' Addendum at 84.  This finding should have foreclosed the ability of the defendant to apportion damages.  However, the Special Master did not follow this reasoning.

Although it is not clear, it appears the Special Master reasoned that plaintiffs failed to show the extent of harm caused by Eveleth Mines in contrast to past emotional harm caused by other emotional experiences.  We can think of no other purpose for the Special Master's exhaustive discussion of plaintiffs' personal backgrounds.  On this basis, the Special Master appears to have reduced the damages awarded to the plaintiffs on the ground that plaintiffs failed to apportion (i.e., separate) their overall harm.  Under the record presented, it is difficult to understand why plaintiffs would attempt to urge any apportionment of damages.  More importantly, they did not have the duty to do so.

Obviously, if this was the Special Master's rationale, it misapplies the doctrine of apportionment.  Assuming the doctrine is applicable, it is the defendant who must prove that any damage caused by other factors was divisible, and if so, what portion of damages the defendant caused.  See Mitchell, 669 F.2d at 1206; Canada, 567

---

harm.  If the harm is divisible, the actor asserting division may be able to limit its liability to damages for the harm it caused plaintiff.  See id.

[10]This rule generally applies when joint tortfeasors cause a plaintiff's damages and also when innocent forces combine with the conduct of a tortfeasor to contribute to a plaintiff's overall harm.  See Rozark Farms, Inc. v. Ozark Border Elec. Coop., 849 F.2d 306, 310 (8th Cir. 1988) (citing Restatement (Second) of Torts § 433A cmt. a (1965)).

N.W.2d at 507; Restatement (Second) of Torts a 433A. Plaintiffs were required to show that defendants' sex discrimination and sexual harassment were substantial factors in causing their emotional harm. The Special Master's individual awards of damages to plaintiffs indicates plaintiffs made this showing. However, what the plaintiffs did not have to prove was that other factors did <u>not</u> contribute to that harm. To limit its liability through apportionment, a defendant must prove that a plaintiff's damages are divisible, and other outside factors contributed to the plaintiff's harm. This the defendants were required to do; this the defendants failed to do.

Plaintiffs argue that Eveleth Mines must take the plaintiffs as it found them. Plaintiffs' position arises from Eveleth Mines' failure to prove that plaintiffs' injuries were an aggravation of a pre-existing condition. Here, although the Special Master erroneously placed the burden of proof regarding aggravation of a pre-existing condition on the plaintiffs, the Special Master ultimately found no pre-existing condition was proven. <u>See</u> Appellants' Addendum at 88-89. Once the Special Master determined this, as a matter of law, the universal doctrine of tort law that a tortfeasor must take the plaintiff as it finds her should apply. <u>See</u> Restatement (Second) of Torts §§ 433A cmt. i, 461 cmt. a.

The Special Master concluded that the "Restatement clearly limits the doctrine to cases involving a pre-existing 'physical condition.'" Appellants' Addendum at 87 (citing Restatement (Second) of Torts § 461 cmt. a). Although he noted some courts have extended the doctrine to underlying emotional instability, and neither the Eighth Circuit nor the Minnesota Supreme Court have spoken directly to the subject, the Special Master declined to apply the doctrine to non-physical conditions. <u>See</u> Appellants' Addendum at 87. We disagree with the Special Master's conclusion.

The "eggshell skull" principle plaintiffs assert is simply another way of stating that foreseeability is not an element of proximate cause. <u>See</u> <u>Christianson v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.</u>, 69 N.W. 640, 641 (Minn. 1896). In

Minnesota, it is well-settled that a tortfeasor is liable for <u>all</u> of its natural and proximate consequences. <u>See</u> <u>Dellwo v. Pearson</u>, 107 N.W.2d 859, 861 (Minn. 1961); <u>Christianson</u>, 69 N.W. at 641. In other words, foreseeability does not limit an award of money damages. This includes damages assessed against a tortfeasor for harm caused to a plaintiff who happens to have a fragile psyche. <u>See</u> <u>McKinnon v. Kwong Wah Restaurant</u>, 83 F.3d 498, 506 (1st Cir. 1996) (defendant must "take the victim as [defendant] finds [the victim], extraordinarily sensitive or not"); <u>Wakefield v. NLRB</u>, 779 F.2d 1437, 1438 (9th Cir. 1986) (administrative agency held that plaintiff's predisposition towards mental illness relieved defendant of responsibility for plaintiff's psychological disability, ignoring "time-honored legal principle" that a wrongdoer takes a victim as the wrongdoer finds the victim); <u>Shimman v. Frank</u>, 625 F.2d 80, 100 (6th Cir. 1980) (defendant liable for plaintiff's psychological injury where the "personality structure" of plaintiff, who was victim of intentional beating, may have made plaintiff more vulnerable to psychological harm); <u>Thames v. Zerangue</u>, 411 So.2d 17, 19-20 (La. 1982) (tortfeasor takes plaintiff as he or she finds plaintiff even though plaintiff had a history of emotional problems); <u>Freyermuth v. Lutfy</u>, 382 N.E.2d 1059, 1064 & 1064 n.5 (Mass. 1978) (defendant liable for tortious conduct that reactivated plaintiff's dormant mental illness); <u>McBroom v. State</u>, 226 N.W.2d 41, 45-46 (Iowa 1975) (applying rule that tortfeasor takes victim as tortfeasor finds him to victim whose status as a prisoner predisposed him to greater psychological harm from a physical injury). <u>But see</u> <u>Munn v. Algee</u>, 924 F.2d 568, 576 (5th Cir. 1991) (stating that "eggshell skull" doctrine has only been applied to pre-existing <u>physical</u> conditions and declining to extend the doctrine's scope absent indication that the Mississippi state courts would also do so).

In conclusion, we find that by whatever synergistic reasoning utilized, the Special Master did not apply proper principles of causation to plaintiffs' claims of emotional harm. We believe the Special Master's erroneous approach played a significant and unfortunate role in limiting plaintiffs' damages. Moreover, as we now discuss, we find the court unduly limited the testimony and opinion evidence of

-13-

plaintiffs' experts relating to that damage.

## II. Expert Testimony

The Special Master excluded the testimony of plaintiffs' expert witnesses regarding causation. The psychiatrists and psychologists called by the plaintiffs possess reputable backgrounds of education and experience in their respective fields. The six medical experts called by the plaintiffs were Dr. Carol Novak, Dr. Claire Bell, Dr. Donald Mayberg, Dr. Randall Lakosky, Dr. Raymond Sampson, and Dr. Kent Newman.

Dr. Novak received her M.D. from the University of Minnesota in 1983, and has been a licensed psychiatrist in the state of Minnesota since 1985. She is a diplomat of the American Board of Psychiatry and Neurology, certified in the specialty of psychiatry, and a diplomat of the National Board of Medical Examiners.[11] Before

_____

[11]The court refused to allow Dr. Novak to testify: as to whether the Diagnostic Statistical Manual directs that it is to be used in conjunction with clinical judgment; why it is important to determine the cause of a mental disorder, whether there are different categories of causes that bring about mental disorders, or whether as part of her diagnosis she must decide if a particular category of causes led to a mental disorder, Trial Tr. Vol. XXIII at 204-10; as to what kind of behavior [such as sexual harassment] she looked for to diagnose Post Traumatic Stress Disorder (PTSD), Trial Tr. Vol. XXIV at 22-27; as to whether she had any preconceived ideas regarding her findings on causation, or whether the plaintiff's PTSD was chronic or acute, Id. at 46-48; as to what symptoms of PTSD were experienced by the plaintiff during the time she was working at the mines, and whether the symptoms the plaintiff was now experiencing could have been caused by a rape when the plaintiff was 19 years old, Id. at 52-54; as to what symptoms the plaintiff displayed that were specifically related to sexual harassment, Id. at 72-73; or as to whether she had identified symptoms that were associated with traumatic events of sexual harassment that led to a diagnosis of anxiety disorder, Id. at 99-100.

testifying in this case, she had diagnosed and treated more than 2,500 patients.

Dr. Bell received her Psy. D. in clinical psychology from Baylor University in 1979 and is a licensed psychologist in the state of Minnesota. In 20 years of practice, she has diagnosed and treated more than 2,000 patients, and has conducted forensic exams in at least 800 cases.[12]

_____

In one instance, the court bluntly stated: "There's no accepted method for assigning weight to a particular stressor as a causative factor when [there is] more than one stressor . . . Insofar as [Dr. Novak's] proffered opinion on causation, on disability and in prognosis this Court finds that it fails to meet the requirements in Rule 702 and to that extent it is disallowed as nonadmissible." Trial Tr. Vol. XXIV at 2271-73.

[12]The court refused to allow Dr. Bell to testify: as to specific symptoms that produce emotional distress, on the grounds that the testimony goes to causation, Trial Tr. Vol. XXV at 22-23; as to the process of isolating events that may produce trauma, whether she considered prior seeking of psychological treatment an indicator of psychological distress, or whether she attempted to isolate potential stressors in determining the degree of their contribution, Id. at 43-47; as to whether she relied upon her understanding of sexual harassment "in isolating any of the potential stressors for the claimants in this case," Id. at 60; as to what "risk factors" make an individual more susceptible to PTSD, Id. at 69-71; as to whether, in her experience, she ever made a diagnosis based on symptoms or conditions occurring in the past; Id. at 113; as to what events she considered to be contributing to the diagnosis of anxiety disorder, whether she ruled out any other potential contributing factors of the source of the diagnosis, or whether an abusive family history had any effect on the condition of the plaintiff, Id. at 151-53; as to whether psychologists are capable of making a diagnosis regarding psychological factors affecting physical conditions, or whether she had made such a diagnosis in the past, Id. at 159-60; as to what specific events she considered to be contributing factors to her diagnosis of PTSD, Id. at 163; as to whether she had an opinion about whether the plaintiff suffered a psychological harm as a result of her exposure to harassment at the mines, Id. at 184; as to what part the "family of origin circumstance" played in the plaintiff's psychological symptoms, Id. at 209-13; as to her opinion regarding the contributing factors to the plaintiff's illness, Id. at 214-15; and as to whether an incident in which the plaintiff had rocks fall on her at the mine related

-15-

Dr. Mayberg received his M.D. from the University of Minnesota in 1952, and is a licensed psychiatrist in the state of Minnesota. Since 1980 he has worked as a clinical professor at the University of Minnesota's Department of Psychiatry. He is a diplomat with the American Board of Psychiatry and Neurology, certified in the specialty of psychiatry, and has diagnosed and treated more than 35,000 patients.[13]

Dr. Lakosky received his M.D. in 1963 and became a certified psychiatrist by the American Board of Psychiatry and Neurology in 1973. He has served as a medical director of the Ramsey County Community Mental Health Center in St. Paul, Minnesota, the Range Mental Health Center in Hibbing, Minnesota, and the Minnesota Department of Human Services. Dr. Sampson received his Ph.D. in counseling psychology from the University of Houston in 1974, and is a licensed psychologist in the state of Minnesota. He is board certified through both the American Board of Professional Psychology and the American Board of Psychological Hypnosis. Dr. Newman received his Ph.D. in psychology in 1977 and has been a licensed

---

to any of the PTSD symptoms, Trial Tr. Vol. XXVI at 31-32.

[13]The court refused to allow Dr. Mayberg to testify: as to whether he, as a psychiatrist, could "determine the cause of a psychiatric . . . disorder or psychiatric symptoms in a forensic setting." Trial Tr. Vol. XXII at 19; as to whether "the literature in the mental health field [has] identified sexual harassment in particular as a cause of mental disorders." Id. at 25-26; as to whether physical reactions to harassment are the kind of symptoms he would use in his diagnostic methodology, whether particular symptoms fit into the diagnostic methodology, or whether sexual harassment in the workplace is recognized as a "stress;" Id. at 31-41; as to which symptoms directed him to particular stresses in his methodology, and whether the symptoms caused by the stresses are the criteria for diagnostic purposes in his methodology, Id. at 117-18; as to his conclusions regarding the stresses the plaintiff was experiencing or the behavior she was exhibiting, to his opinion on the plaintiff's prognosis, or to any other stressors on the plaintiff, other than those listed in the expert's report, Id. at 171-73; that "there is a relationship between the experiences in the mine of 1984 and the present," and as to whether plaintiff's physical symptoms are still present, Id. at 207-09.

psychologist in the state of Minnesota since 1983. Since 1984 he has conducted hundreds of psychological examinations for the Social Security Administration, relating to psychological disability claims.

Without need to further elaborate on the record, we find the trial court erred in restricting and rejecting the testimony of these expert witnesses. The Special Master made two questionable observations which we believe are at the root of his rulings excluding the opinions of plaintiffs' expert witnesses. First, the court found: "There is, therefore, no scientifically developed psychiatric model or procedure for determining whether a  particular stress caused a particular symptom or mental state." Appellants' Addendum at 83. Second, the court, perhaps misled by its erroneous application of principles of causation, found:

> The evidence establishes that, while working at Eveleth Mines and previously, most of the claimants were subjected to outside stresses or trauma, or suffered from emotional problems, which could have had psychological impact and caused symptomatology. No one advanced a validated theory which furnishes a scientific basis for distinguishing between the causal effect of multiple psychological stresses or trauma, or for assigning relative impact or degree of impact to different trauma or stresses. This Court is persuaded by unanimous testimony of psychiatrists and psychologists, called by both sides, that there is no scientific method for determining the cause of a mental disorder or for allocating proportionate cause when more than one possible cause exists.

Id. at 83-84.

The Special Master rejected all opinion evidence proffered by the plaintiffs' experts. See id. at 84. Ironically, the Special Master, notwithstanding the above

-17-

observation, generally accepted the opinions of the expert witnesses produced by the defendants.[14] The imbalance in its rulings is difficult to explain.

The Special Master viewed the psychiatric proof as to causation of mental harm and prognosis as being incompetent. Without the ability to offer expert testimony regarding causation, the plaintiffs were denied the ability to meet the burden of proof assigned to them in regard to their emotional damage.

Upon a reading of the record, ineluctably we are led to conclude that the Special Master's exclusion of this testimony did not rest upon any recognized area of discretion. The record strongly suggests the Special Master foreclosed consideration of the evidence based on his own preconceived notions relating to psychiatric proof. The Special Master did not attempt to hide his hostility toward psychological evidence in sexual harassment claims, stating: "'Experts' . . . know no more than judges about what causes mental changes -- which is to say that they know almost nothing." Appellants' Addendum at 84 (quoting Bohen v. City of East Chicago, 622 F. Supp. 1234, 1243 n.4 (N.D. Ind. 1985), rev'd on other grounds, 799 F.2d 1180 (7th Cir. 1986)).

To the extent the Special Master relied upon Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) to support his rulings, we find his rulings to be in error.[15] In Daubert, the Supreme Court addressed the standards of admissibility

---

[14]See Appellants' Addendum at 117-18, 165-69, 191-92, 218-19, 228-29, 259-63, 277-78, 328-32, 362-63, 376-78, 391, 410-11, 432-35.

[15]At the time of this writing, the Supreme Court was considering the question of the appropriate standard of appellate review for trial court decisions excluding expert testimony under Daubert. See Joiner v. General Elec. Co., 78 F.3d 524 (11th Cir. 1996), cert. granted, ___U.S. ___, 117 S.Ct. 1243 (1997). However, even under a restrictive "abuse of discretion" standard, we find that the Special Master erred as a matter of law in excluding expert testimony on causation. Therefore, resolution of the standard of review question in Joiner does not affect our decision in this case.

for specific evidence under Federal Rules of Evidence 702.[16] There is some question as to whether the <u>Daubert</u> analysis should be applied at all to "soft" sciences such as psychology, because there are social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies. <u>See</u> <u>Daubert</u>, 509 U.S. at 590 n.8 ("Rule 702 also applies to 'technical, or other specialized knowledge.' Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). However, the question of whether <u>Daubert</u> should be applied to the psychological evidence excluded here does not affect our ruling in this case, because we find that under either <u>Daubert</u> or under the more general parameters of Rule 702, the proffered testimony was both reliable and relevant, and should have been admitted into evidence.

In <u>Daubert</u>, the Court rejected the general acceptance test for novel scientific evidence from <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923), and provided more flexible guidelines for admissibility of scientific evidence under Rule 702. The trial judge is charged with a "gatekeeping" role to ensure that all scientific testimony or evidence admitted is both reliable and relevant. <u>Daubert</u>, 509 U.S. at 589 n.7, 597. The Court emphasized that an expert must testify as to scientific knowledge. Such knowledge "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." <u>Id.</u> at 590. This knowledge must "assist" the trier of fact. <u>Id.</u> at 591. In other words, the scientific knowledge must be relevant to the issue before the court. In order to determine whether the scientific reasoning is valid under <u>Daubert</u> and whether that reasoning can be applied properly

---

[16]Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

to the facts at issue, the trial court is to consider factors such as whether the reasoning: 1) can be and has been tested, 2) has been subjected to peer review, 3) has a known or potential rate of error, and 4) has been generally accepted by the scientific community. Id. at 593-94. The Daubert court stressed that "many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." 509 U.S. at 593. It is clear the Court did not intend for a trial judge to automatically exclude relevant evidence if one of these conditions was not fully satisfied.

The record indicates the opinion evidence offered by the plaintiffs' expert witnesses was thorough and meticulously presented. The methodology for arriving at their opinions was laid out clearly by each witness. The key question in this damages phase of the trial was the causal link between the actions of the defendants and the claimed emotional injuries of the plaintiffs. The expert testimony was therefore without doubt relevant to the issue before the court.

For these reasons, we find that the overall testimony was erroneously excluded under Rule 702 of the Federal Rules of Evidence and established precedents of this court. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283 (8th Cir.), cert. denied, ___U.S.___, 116 S. Ct. 84 (1995) (quoting Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990)). The rule clearly "is one of admissibility rather than exclusion." Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir.), cert. denied, 502 U.S. 913 (1991); Fox, 906 F.2d at 1256; see also Hurst v. United States, 882 F.2d 306, 311 (8th Cir. 1989) ("A trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder."). This court has cautioned that "blanket evidentiary exclusions can be especially damaging in employment discrimination cases," Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988), and has disapproved such categorical exclusions by the same Special Master in a prior sexual harassment case which "unfairly prevented" proof of

plaintiff's claim.  Hawkins v. Hennepin Technical Center, 900 F.2d 153, 155-56 (8th Cir.), cert. denied, 498 U.S. 854 (1990).

In affirming an award of compensatory damages to a victim of sex discrimination, this court and others recently have noted the probative value of expert psychological proof regarding causation of the claimant's depression and emotional distress.  Karcher v. Emerson Elec. Co., 94 F.3d 502, 509 (8th Cir. 1996), cert. denied, ___U.S.___, 117 S.Ct. 1692 (1997); see also Webb v. Hyman, 861 F. Supp. 1094, 1114 (D. D.C. 1994) (psychologist testified that harassment caused plaintiff's mental harm by bringing out deeply repressed emotions relating to her childhood abuse);  Alberts v. Wickes Lumber Co., 69 Fair Empl. Prac. Cas. (BNA) 304, No. 93C 4397, 1995 WL 557473 (N.D. Ill. Sept. 15, 1995) (admission of expert proof that harassment caused plaintiff's panic disorder and countervailing proof from defendant); Hurley v. Atlantic City Police Dep't, 933 F. Supp. 396, 424 (D. N.J. 1996) (expert proof showed mental harm  including adjustment disorder caused by sexual harassment).  The psychological proof presented by the plaintiffs in this case clearly possessed enough probative value to be admitted for consideration by the court.

In summary, our review of the record leads us to conclude that the testimony of plaintiff class' expert witnesses, who were well-qualified, should have been admitted into evidence.  In doing so and in our remand, we emphasize that the weight and credibility of this evidence is left to the trier of fact, which in this case is the district court.  However, there is little doubt that exclusion of such evidentiary proof could appreciably  affect the damages awarded to the plaintiff class.

We now turn to the other claims raised on appeal by the plaintiff class.


III. Constructive Discharge Claims


-21-

During the damage phase of this litigation, plaintiffs Alaspa, Anderson and Jenson sought compensatory damages in the form of lost wages. The Special Master treated these damages claims as claims of constructive discharge.[17] The Special Master concluded: (1) plaintiffs failed to prove the working conditions and Eveleth Mines' conduct actually caused them to resign; and (2) plaintiffs' evidence of future lost wages was too speculative to allow recovery. The district court affirmed, without discussion, the Special Master's conclusions of law and findings of fact rendered in connection with these claims. Appellants' Addendum at 44. We reverse and remand this issue to the district court for reconsideration.

We find the Special Master did not apply the appropriate burden-shifting principles in its analysis of the constructive discharge claims. Specifically, the Special Master failed to place the burden of proof on Eveleth Mines to show that the plaintiffs' resignations were not caused by the hostile working environment once the Special Master determined the individual plaintiff had established the requisite subjective element of their hostile environment claim.

_____

[17]The exact procedural posture of these claims is unclear from the record. At the time the first amended complaint was filed, all of these women were still working at the mines. The constructive discharge claims apparently were raised between the completion of the district court's Jenson II decision and the damages phase trial before the Special Master. Eveleth Mines points out that the plaintiffs never pled their constructive discharge claims and the same were not litigated by consent. Appellees' Br. at 43, n.60. The Special Master noted that Anderson "did not advance a formal claim of constructive discharge which could have been considered prior to trial . . . ." Appellants' Addendum at 184, n.151. He also noted that consideration of Anderson's claim during the damages phase was "suspect." Id. The complaint does allege on behalf of the class damages in the form of back and front pay. The Special Master concluded that the plaintiff class did not need to file a new complaint for the damages earlier pled by the class. Regardless of their origin, the lost wage claims arising out of the hostile environment are part of the alleged compensatory damages and were properly before the Special Master.

-22-

In Franks v. Bowman Transp. Co., 424 U.S. 747 (1976) and International Bhd. of Teamsters v. United States, 431 U.S. 324 (1977), the Supreme Court set forth the burden-shifting standards to be used in a Title VII class action.  Under Franks, the class action plaintiffs bear the burden of proving their prima facie case of sex discrimination during the liability phase of the litigation.  Once proven, the burden of proof shifts to the defendant in the remedial phase to show the adverse employment action was not the product of discrimination.  This court has explained that in an action involving both class claims and individual claims, where a finding has been made of classwide discrimination, the district court is required to use the Franks burden-shifting analysis to resolve both types of claims.  See Craik v. Minnesota State Univ., 731 F.2d 465, 481 (8th Cir. 1984).

The district court originally recognized that the Franks burden-shifting analysis applied to the individual claims for constructive discharge in its Order dated December 22, 1994.  Then, the district court stated:

> In light of the Court's holding that the class had successfully established a pattern or practice of hostile environment sexual harassment, it appears that the burden-shifting analysis of International Bhd. of Teamsters should apply.  Thus, Jarvela and Mesich need only establish that they were "potential victims of the proved discrimination" in order to shift the burden of persuasion onto Eveleth Mines to show that it is more likely than not that their decision not to return to work at the mines was not the product of the hostile work environment.

Jenson v. Eveleth Taconite Co., Civ. No. 5-88-163, at 12 (D. Minn. Dec. 22, 1994) (order granting partial summary judgment.) (citations omitted).[18]

---

[18]The district court concluded Mesich and Jarvela could not maintain constructive discharge claims because both women had been absent from work for significant periods of time prior to and at the time each resigned.  Mesich and Jarvela do not appeal this finding.

The district court's reasoning applies equally well to the lost wage claims of Alaspa, Anderson and Jenson.

Applying the Franks framework to this case, to make a prima facie case the three plaintiffs have the burden of showing that the working conditions at the mine were so intolerable that they were compelled to resign. See Gartman v. Gencorp, Inc., 120 F.3d 127, 129-30 (8th Cir. 1997); Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996). The district court already had found that an extremely hostile work environment existed at the mines. See Jenson II, 824 F. Supp. at 887. We believe the district court's findings in Jenson II show that the working conditions at the mines were so hostile as to be intolerable.

In the damages phase, the plaintiffs still were required to show they were as affected by that hostile environment as a reasonable woman would be affected. See Jenson II, 824 F. Supp. at 876. However, once they made that showing, the burden of proof shifted to Eveleth Mines to show that it was more likely than not that their decision to not return to work was not the product of the hostile work environment. On this basis, these claims for economic loss are remanded to the district court to be calculated under the proper burden-shifting principles.

The Special Master also erred in finding that the evidence of lost wages was too speculative to allow recovery. The Special Master had at his disposal the testimony of both the plaintiffs' expert witness, Dr. Edward Foster, and the defendants' expert witness, Dr. Elizabeth Gunderson. Though the experts based their methodologies for calculating future lost wages on different assumptions, both models of calculations were available to the Special Master to estimate plaintiffs' damages. The Special Master refused to make such an estimate, stating:

> [A]n academic exercise which merely provides a partial pattern into which
> a court must insert figures and resolve questions on an intuitive

basis lacks logical nexus between the expert's calculation and the facts of the case and is not sufficient to discharge plaintiff's burden of proving wage loss through evidence which is more than speculative.

Appellants' Addendum at 131-32.

At the same time, the Special Master regarded Dr. Gunderson's methodology to be "personalized and realistically pragmatic," Appellants' Addendum at 130, but refused to use Dr. Gunderson's methodology because plaintiffs did not provide the Special Master with sufficient facts in which to form an estimate.

We find the Special Master abrogated his fact-finding duties by refusing to use either Dr. Foster's or Dr. Gunderson's methodology to calculate lost wages. The Special Master did not provide any valid reasons for not using one of the two alternative formulations before it to estimate the plaintiffs' damages.

## IV. Punitive Damages

All plaintiffs asserted claims for punitive damages against Eveleth Mines under state law. The MHRA allows a plaintiff to seek punitive damages under Section 549.20 for a violation of the MHRA. The pre-1990 Section 549.20, subd. 1, provided: "Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others." Minn. Stat. § 549.20, subd. 1 (1988).

The Special Master concluded plaintiffs had failed to prove, by clear and convincing evidence, that Eveleth Mines should be held vicariously liable for the acts of its employees.[19] Under Section 549.20, subd. 2, a principal may be held liable for

---

[19]The district court, with apparent reservation, affirmed the Special Master's findings. Appellants' Addendum at 41.

punitive damages based on the acts of its agents if (1) the agent worked in a managerial capacity and acted in the scope of employment, or (2) the principal ratified or approved of the acts of the agent. The Special Master found plaintiffs failed to submit sufficient evidence to identify which managers at Eveleth Mines knew of the discriminatory acts. Appellants' Addendum at 455-56. He also found the foremen who sexually harassed the plaintiffs or who knew of the harassment were not "managerial employees" and therefore Eveleth Mines could not be held vicariously liable for their actions. Id. at 455. We find the Special Master erred as a matter of law by examining the plaintiffs' punitive damages claims under the vicarious liability standard in § 549.20, subd. 2. Given the posture in which the case was presented to the Special Master, we hold the appropriate legal standard for the plaintiffs' punitive damages claims is the direct liability standard of § 549.20, subd. 1.

In Jenson II, the district court found Eveleth Mines violated Title VII and the MHRA by engaging in "a pattern or practice of discriminating against women in promotions to step-up foreman," 824 F. Supp. at 874, and "a pattern or practice of maintaining an environment sexually hostile to women." Id. at 888. This type of systemic discrimination has been defined as:

> Employment policies or practices that serve to differentiate or to perpetuate a differentiation in terms or conditions of employment of applicants or employees because of their status as members of a particular group. . . . Systemic discrimination . . . concerns a recurring practice or continuing policy rather than an isolated act of discrimination.

Lindemann & Grossman, Employment Discrimination Law 1142, n.258 (3rd ed. 1996) (quoting 1 Aff. Action Compl. Man. (BNA) § 2:0005.)

Only an employer can commit this type of discrimination. In Jenson II, the district court determined that the wrongful act at issue was not the individual harassing acts of

the employees at the mine, but rather Eveleth Mines' pattern and practice of discriminating against women and maintaining a hostile working environment.

The Special Master mistakenly believed plaintiffs had to impute the "wilful indifference" of the supervisory employees to Eveleth Mines. Appellants' Addendum at 454. The district court found that Eveleth Mine had maintained a sexually hostile working environment both before and during the class period, spanning in total eighteen years.[20] Jenson II, 824 F. Supp. at 877-78, 888. The sexual harassment occurring at the mines was so common, continuous and pervasive that Eveleth Mines knew or should have known of the problems. Id. at 887. In fact, the district court found first-line supervisors had actual knowledge of the harassment. Id.

The district court found that notwithstanding such knowledge, Eveleth Mines took no meaningful action to remedy these problems. Id. at 888. The defendants failed to investigate whether the sexual harassment complaints lodged were indicative of a larger, company-wide problem. Id. at 887. The court also found that Eveleth Mines did not implement a system for handling sexual harassment complaints. Id. Eveleth Mines did not attempt to remove or control the display of sexually offensive visual materials, even though management knew of its existence. Id. Finally, Eveleth Mines never tried

---

[20]In so doing, we note the Special Master stated that Eveleth Mines' legal obligation to recognize and respect a female employee's right to work in an harassment-free environment did not arise until 1986 when the Supreme Court issued its decision in Meritor Sav. Bank. v. Vinson, 477 U.S. 57 (1986). As plaintiffs point out, the Minnesota Supreme Court stated in 1980 that it was illegal for an employer to maintain a sexually hostile working environment. See Continental Can Co., Inc. v. State, 297 N.W.2d 241, 249 (Minn. 1980). More importantly, Title VII has made an employer's discrimination against an employee on the basis of sex an unlawful employment practice since its passage by Congress in 1964. The Special Master also found that Eveleth Mines had acted reasonably in light of the historical and existing culture of the Iron Range. Appellants' Addendum at 461. This conclusion directly contradicts the Jenson II decision holdings discussed above.

to speak with the male employees about what is considered unacceptable conduct in the workplace. Id. at 888. The district court concluded that "Eveleth Mines failed to take prompt remedial action to alleviate the hostile environment," id., and thereby facilitated the hostile environment. The district court observed: "It is undisputed that, aside from the policy statement in the CBA [collective bargaining agreement], Eveleth Mines has not made any effort to control or prevent, on company-wide basis, acts of sexual harassment." Jenson II, 824 F. Supp. at 888, n.96.

Whether an award of punitive damages is appropriate is, in essence, a factual determination. Therefore, we remand the punitive damages claims for reconsideration under the appropriate legal standard set forth in Section 549.20, subd. 1.

## V. Statute of Limitation - Diane Hodge

When the plaintiff class was certified in Jenson I, the district court determined that the class shall consist of "all women who have applied for, or have been employed in, hourly positions at Eveleth Mines at any time since December 30, 1983" and have been discriminated against because of their gender. 139 F.R.D. at 667.

Eveleth Mines hired Diane Hodge in 1977. She was laid off by the company in July 1983, but returned to work five years later in July 1988. Plaintiffs argue that, like the other claimants, Ms. Hodge was a victim of the sexually hostile work environment maintained by the defendant and is entitled to compensation. However, the Special Master denied recovery to Ms. Hodge, ruling that because the majority of the harassing behavior directed toward her took place prior to December 30, 1983, her hostile work environment claim was time barred. See Appellants' Addendum at 243-44. Ms. Hodge testified that prior to 1983 she was regularly subjected to sexually explicit language and graffiti, dirty jokes and adult magazines in the workplace. She testified that in 1978 or 1979 a step-up foreman grabbed her breasts, groped her, and made

other sexual advances. During the same time period, another step-up foreman made sexual remarks and suggestions to her. In 1980, Ms. Hodge testified, she worked for another foreman who would constantly subject the crew to stories of his sexual exploits. See Trial Tr. Vol. XIII at 203-40.

Normally, liability cannot be based upon evidence of sexual harassment which occurred prior to the commencement of the class period, which in this case began on December 30, 1983. See Hervey v. City of Little Rock, 787 F.2d 1223, 1229 n.5 (8th Cir. 1986). However, in Jenson II, the district court directed that evidence of sexual harassment prior to commencement of the class period would be considered under a "continuing violation theory," which permits a court to consider alleged discriminatory acts occurring prior to the statutory limitation period for Title VII actions. 824 F. Supp. at 877; see Chaffin v. Rheem Mfg. Co., 904 F.2d 1269, 1271 (8th Cir. 1990); Gardner v. Morris, 752 F.2d 1271, 1279 (8th Cir. 1985); Satz v. ITT Fin. Corp., 619 F.2d 738, 744 (8th Cir. 1980).

The Special Master's ruling denying recovery to Ms. Hodge was based on his finding that her claim could not be established as a continuing violation, because any "objectional conduct" she experienced during the class period was "an isolated incident" and "unrelated temporally or factually to acts of discrimination evidencing a hostile work environment . . . ." Appellants' Addendum at 244. Ms. Hodge testified that in 1992 she was humiliated and degraded when a foreman came up to a truck in which she and a male employee were sitting and asked if she and the worker were having sex. Trial Tr. Vol. XIII at 253-54. Upon review of the record, we find the Special Master reached this conclusion by disregarding the district court's ruling in Jenson II, and incorrectly applying the continuing violation theory under the law of this circuit.

In finding the continuing violation theory should be applied in this case, the Jenson II district court stated: "In the arena of sexual harassment, particularly that

which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature . . . ." 824 F. Supp. at 877. The court also stated that to establish a continuing violation, "the critical question is whether 'any present violation exists' during the statutory period." Id. (quoting United Airlines, Inc. v. Evans, 431 U.S. 553, 558 (1977)).

The Special Master created a formalized test to determine whether there was a continuing violation. See Appellants' Addendum at 244. He then used this test to wipe out Ms. Hodge's claim, stating that the harassing conduct to which Ms. Hodge had been subjected had not occurred with enough frequency to establish a continuing violation. Id.

However, the formalized test employed by the Special Master has never been utilized before by this court to determine a continuing violation, and we decline to do so today. It is settled law in the Eighth Circuit that "[t]he rationale underlying the allowance of actions for continuing discrimination is to provide a remedy for past actions which operate to discriminate . . . at the present time." Olson v. Rembrandt Printing Co., 511 F.2d 1228, 1234 (8th Cir. 1975) (citing Marquez v. Omaha Dist. Sales Office, 440 F.2d 1157, 1160 (8th Cir. 1971). It also is well settled that an isolated event, even one with continuing impact, alone does not constitute a continuing violation. Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 486 (8th Cir. 1997). However, when a plaintiff challenges an ongoing pattern or practice of discrimination rather than one isolated instance, the alleged violation may be deemed continuing. See Chaffin, 904 F.2d at 1271; Gardner, 752 F.2d at 1279; Satz, 619 F.2d at 743-44. As the Jenson II court correctly noted, the critical question in the continuing violation analysis, according to the Supreme Court, is to establish that any violation exists during the statutory period. 824 F. Supp. at 877 (citing Evans, 431 U.S. at 558).

We find that all of the plaintiffs, including Ms. Hodge, have met their burden to establish a continuing violation. Ms. Hodge and the other plaintiffs are not challenging

an isolated instance of sexual harassment, but instead the <u>ongoing pattern or practice</u> of the defendants' maintenance of a hostile work environment. Thus, the violation may be deemed continuing under the law of this circuit, if the plaintiff establishes that any violation took place during the statutory period. See <u>Chaffin</u>, 904 F.2d at 1271; <u>Gardner</u>, 752 F.2d at 1279; <u>Satz</u>, 619 F.2d at 743.

The Special Master conceded that Ms. Hodge was subjected to sexual harassment on at least one occasion during the statutory period. See Appellants' Addendum at 243. In addition to this incident, Ms. Hodge testified that since 1990 she has repeatedly been subjected to graphically sexual language in the workplace. Trial Tr. Vol. XIII at 255-56.

Because Eveleth Mines was engaged in a pattern and practice of discrimination by maintaining a hostile work environment, and because Ms. Hodge established that she was subjected to at least one incident of harassing behavior during the statutory period, we find that her claim is part of a continuing violation and is not time barred. The Special Master's finding to the contrary is in error.

## VI. Survival of Claim - Patricia Kosmach

Prior to the damages phase of the trial, plaintiffs moved to substitute Susan Bonach as a party to the action in place of her deceased mother, class member Patricia Kosmach. The Special Master denied the motion on the grounds that Kosmach's claim abated pursuant to Minn. Stat. § 573.01. Appellants' Addendum at 1. The district court affirmed the Special Master's ruling.

Plaintiffs assert that the MHRA, not the survival statute codified at § 573.01, determines whether an MHRA claim survives the death of the plaintiff. Plaintiffs argue that the plain language meaning of the MHRA allows the substitution of a legal

-31-

representative in a cause of action brought under the MHRA. Thus, plaintiffs argue, Kosmach's claim survives her death, irrespective of the survival statute.

The MHRA states: "Any person aggrieved by a violation of this chapter may bring a civil action . . . ." Minn. Stat. § 363.06, subd. 1. "Person" is defined as: "partnership, association, corporation, legal representative, trustee, trustee in bankruptcy, receiver, and the state and its departments, agencies, and political subdivisions." Minn. Stat. § 363.01, subd. 28 (emphasis added). We cannot conclude these provisions reflect a legislative intent to create a right of survival for MHRA civil rights claims. By the inclusion of "legal representative" in the definition of "person," the legislature may have intended to allow a claim to be brought on behalf of a party who is unable to bring the claim.

Whether Kosmach's claim survives her death must be evaluated under Minnesota survival statute codified at § 573.01. That section provides:

> A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists . . . . All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.[21]

Minn. Stat. § 573.01, (1996).

The Minnesota Court of Appeals has determined the MHRA claims constitute "injury to the person" and thus abate upon the death of the claimant. Lipka v. Minnesota Sch. Employees Ass'n, 537 N.W.2d 624, 630 (Minn. Ct. App. 1995). We therefore conclude under Minnesota law Kosmach's claim in this action abated upon her death.

---

[21]Section 573.02 contains an exception to abatement for claims for special damages. Kosmach did not seek specific damages in this action, and therefore does not qualify for the exception.

## VII. Conclusion

It should be obvious that the callous pattern and practice of sexual harassment engaged in by Eveleth Mines inevitably destroyed the self-esteem of the working women exposed to it. The emotional harm, brought about by this record of human indecency, sought to destroy the human psyche as well as the human spirit of each plaintiff. The humiliation and degradation suffered by these women is irreparable. Although money damage cannot make these women whole or even begin to repair the injury done, it can serve to set a precedent that in the environment of the working place such hostility will not be tolerated.

In view of our rulings, we remand this case to the district court for a trial *de novo* on the issue of damages. The parties may stipulate as to the use of any testimony previously given. The district court may supplement any testimony given. At this stage, we feel the district court should decide the damage issues and not make further reference to any Special Master. We recognize this places a tremendous burden on the court, but in view of the record, we hesitate to introduce any new fact finder into the case.

In our supervisory role, we make the following observation. Our purpose in making this observation is to express our concern about the inordinate delay encountered by the parties to this case. This case has been pending for almost ten years. The final chapter is yet to be written. No one can expect that justice will be rendered to any of the parties when a final opinion is issued more than ten years after this litigation commenced. Even worse, the judiciary must now try to provide reparation for harm dating back to 1983.

The executive and legislative branches of our government bear some responsibility for this delay. During much of the intervening time, the District of Minnesota was short-handed because of the delayed appointments of two district

judges. The problem is a continuing one, from the far past to the present. Much of the responsibility for judicial vacancies is attributable to the political process and the refusal to expedite judicial appointments. This delay only serves to aggravate the litigation crunch Article III judges confront on a daily basis. The ultimate victims of this delayed process are the American people.

Responsibility also lies with the bar whose members are officers of the court. The lawyers in this case delayed its resolution by exercising senseless and irrelevant discovery, and by making endless objections at trial. But "the buck stops here;" the judicial system allowed the lawyers to do what they did. If our goal is to persuade the American people to utilize our courts as little as possible, we have furthered that objective in this case. If justice be our quest, citizens must receive better treatment. The judiciary must somehow afford more efficacious monitoring of delayed cases. We must achieve this goal through action, not just by words.

Upon remand, we require the district court to expedite a new trial. We also implore the parties to sincerely make every effort to resolve their differences.

JUDGMENT OF DISMISSAL OF PATRICIA S. KOSMACH'S CLAIM IS AFFIRMED.

THE JUDGMENT AWARDING DAMAGES FOR THE PLAINTIFFS IS HEREBY VACATED AND THE CAUSE IS REMANDED FOR A NEW TRIAL ON PLAINTIFFS' COMPENSATORY AND PUNITIVE DAMAGES CLAIMS.

A true copy.

Attest:

           CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.